IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| OSWALD NELSON | ) | |
| | ) | |
| v. | ) | NO. 3:11-0514 |
| | ) | |
| DAVIDSON COUNTY SHERIFF'S OFFICE | ) | |

TO: Honorable Aleta Trauger, District Judge

# REPORT AND RECOMMENDATION

By Order entered June 13, 2011 (Docket Entry No. 5), the Court referred this action to the Magistrate Judge to enter a scheduling order, to dispose or recommend disposition of any pretrial motions under 28 U.S.C. §§ 636(b)(1)(A) and (B), and to conduct further proceedings, if necessary, under Rule 72(b) of the Federal Rules of Civil Procedure, and the Local Rules of Court.

Pursuant to the Orders entered December 30, 2011 (Docket Entry No. 30), and May 22, 2012 (Docket Entry No. 35), an evidentiary hearing was held before the Magistrate Judge on June 20, 2012. Set out below are the Court's findings of fact and recommendation for disposition of the action.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The plaintiff, currently an inmate of the Tennessee Department of Correction ("TDOC"), filed his complaint pro se and in forma pauperis on May 18, 2011, seeking three million dollars in damages for alleged violations of his civil rights and requesting a jury trial. Although the plaintiff

was a TDOC inmate at the time he filed the complaint, the events at issue in the action occurred while he was in the custody of the Davidson County, Tennessee Sheriff's Office ("DCSO") confined at the Criminal Justice Center ("CJC") and the Correctional Development Center ("CDC").

The plaintiff was booked into the CJC on September 10, 2010. He asserts that he suffers from mental illnesses, including bipolar disorder, anxiety disorder, and paranoia, for which he takes medication and alleges that he explained to the nurse who saw him upon intake at the CJC that he had been off his medications for about two months, had been self-medicating with Lortab, cocaine, and marijuana, and needed to see someone from the mental health staff or get on his medications. He contends that the nurse told him it would take a few days to get his medical records. He asserts that he was not seen by the mental health staff and did not immediately receive his medications and was moved to the CDC within the next day or two. He alleges that he filled out sick call requests and grievances and made oral complaints to officers at the CDC about the fact that he was paranoid, could not sleep, was irritated, was hearing voices, and needed his medications, but that he was not promptly seen by the mental health staff or prescribed medications.

The plaintiff also asserts that, after being moved to the CDC, he injured his hand on two occasions, once falling off his bunk and once in a fight with other inmates, but was not given treatment for these injuries. He contends that he was examined by a nurse and nurse practitioner after the first injury but the only treatment he received was a "wrap" and his hand was not x-rayed despite the nurse practitioner telling him that she was going to have it x-rayed. He contends that a nurse saw him after the fight and took pictures of his hand, but no actual treatment was provided. The plaintiff was then transferred back to the CJC where he alleges that his sick call requests and grievances about his hand were ignored for a month prior to his transfer to the TDOC.

2

In the order of referral, the Court found that the plaintiff had alleged non-frivolous claims against the DCSO but dismissed the "Mental Health Department" and "Medical Department," which were also named as defendants in the Complaint. See Docket Entry No. 5, at 2. Upon the defendant's filing of its answer (Docket Entry No. 29), a scheduling order (Docket Entry No. 30) was entered setting out deadlines for discovery and pretrial activity in the action. No dispositive motions were filed, and there are no motions pending in the action.

## II. FACTUAL FINDINGS

At the evidentiary hearing, the plaintiff proceeded pro se and testified. Paul Babb testified on behalf of the defendant. There were no other witnesses. Based on the testimony presented at the hearing and on the entire record in this action, the Court makes the following factual findings.

The plaintiff suffers from mental illness, which he testified included bi-polar disorder, schizophrenia, anxiety, and paranoia. He testified that he has been treated for these problems for approximately 15 years and is currently taking two prescribed medications, Trazadone and Tegretol. He testified that the medications do not completely remedy his mental illness but they help him manage his behavior and thoughts and that he is aware of his problems and knows when he is without his medications and when he is taking them. He testified that it takes approximately three weeks for the effects of the medications to help him after he begins taking them.

The plaintiff entered the CJC and the custody of the DCSO on September 11, 2010, after his probation was revoked. He testified that, although he had been at a half-way house, he stopped taking his medications and then relapsed and began taking cocaine and marijuana. The plaintiff was unable to state exactly when he left the DCSO and was transferred to the TDOC. However, it

appears that he was in the custody of the DCSO for approximately two months and was transferred to the TDOC sometime in November 2010.[1]

The plaintiff was seen by a nurse upon his intake into the CJC. He testified that he told her about his mental health needs, his need for medication, and his recent drug usage, but that she stated that he would have to wait 72 hours before he could receive any medications. The plaintiff testified that he had been in the CJC on prior occasions and was usually taken "downstairs" at the CJC where there is a mental health unit.

The plaintiff was transferred to the CDC within two or three days of arriving at the CJC. He testified that he was transferred to the CDC for an evaluation for entry into a drug treatment program. He was not sure how long he stayed at the CDC, but he testified that he thought it was for a month or two. The plaintiff testified that he received his mental health medications at the CDC within a few weeks of being there and continued to receive after that time. Although the plaintiff could not remember exactly when he began to receive his medications, a copy of a grievance response form he submitted with his complaint indicates that he was seen by a mental health provider on September 27, 2010, and prescribed his medications at that time. See Docket Entry No. 1-2, at 1. The form also indicates that a mental health provider attempted to see the plaintiff on September 17, 2010, but that '[the plaintiff] had a conflict with your scheduling for that day." Id. There was no explanation offered at the hearing for why the September 17, 2010, meeting did not occur. The plaintiff testified that, during the period when he was without his medications, he was paranoid.

---

[1] The TDOC trust fund account printout accompanying the affidavit of indigency attached to the plaintiff's application to proceed in forma pauperis includes an entry dated November 23, 2010, for a transaction at the CBCX, an abbreviation commonly used to refer to the TDOC's Charles Bass Correctional Complex. See Docket Entry No. 3-1, at 6. Accordingly, it appears that the plaintiff was transferred to the custody of the TDOC by at least this date.

The plaintiff's mental health records at the DCSO are not a part of the record in this action and were not offered as an exhibit at the evidentiary hearing. There was no testimony provided by the defendant regarding any mental health treatment received by the plaintiff while at the CJC or the CDC. Other than his initial complaints about not being provided with his medications, the plaintiff offered no evidence that he sought and was denied any mental health treatment after September 27, 2010.

The plaintiff testified that he fell off his top bunk bed while at the CDC and injured his hand. He testified that he complained to a guard, was seen by a nurse, and was eventually examined by a nurse practitioner. He testified that the nurse practitioner ordered that he be given an extra blanket to elevate his hand and stated that she would have the hand x-rayed, but he did not receive an x-ray or an extra blanket. He testified, however, that a nurse later gave a bandage to wrap around his wrist and hand. The plaintiff did not know when he fell off the bunk, but a copy of a medical order attached to his complaint indicates that an order for an extra blanket was made on September 26, 2010. See Docket Entry No. 1-2, at 2.

The plaintiff testified that he injured the same hand again in a fight with another inmate at the CDC "three or four days later" and that his hand was swollen and painful and had a "knot" on it. He testified that a nurse came to his holding cell and took a picture of his hand but that no actual treatment was provided at that time.

The plaintiff testified that he was sent back to the CJC at some point after he kicked a cell door at the CDC and was put in segregation or confinement at the CJC. He testified that he turned in numerous sick call slips and grievances about his hand but that he was not seen until several weeks later. He testified that the nurse who saw him was "mad" at him and said she forgot about

5

him and then sent him back to his cell without any treatment. In a copy of a grievance form submitted by the plaintiff with his complaint, the plaintiff states that he was seen on October 20, 2010, but received no treatment. See Docket Entry No. 1-2, at 4.

The plaintiff testified that the injury to his hand was painful but that the only lasting effect has been that he cannot put as much pressure on his wrist as he could prior to the injuries. He states that a nurse practitioner examined him at the CBCX after he left the DCSO and gave him a wrist support to wear but that no other treatment was provided for the injury. The plaintiff does not know when this examination occurred. The defendant offered no evidence regarding the treatment provided to the plaintiff regarding his hand injury.

Paul Babb testified that he is employed by the Mental Health Cooperative as the Program Manager for the DCSO's jail facilities. He testified that health care for inmates within the DCSO has been contracted out to Correct Care Solutions ("CCS") and that CCS has subcontracted mental health treatment for the inmates to the Mental Health Cooperative. He testified that a team of three psychiatric professionals and six mental health professionals provide mental health treatment to DCSO inmates and that the normal procedure is that all inmates who enter the DCSO have a physical and mental health assessment within 14 days of entering the DCSO, but that the CCS intake nurse can refer inmates to be seen by the mental health staff if needed.

### III. CONCLUSIONS

The purpose of the evidentiary hearing is to inquire into the factual basis of the plaintiff's claims. Johnson v. Bi-State Justice Ctr., 12 F.3d 133, 135-36 (8th Cir. 1993). In making this inquiry, the Court has construed the evidence in the light most favorable to the plaintiff, has given

the plaintiff the benefit of all reasonable inferences that can be drawn from this evidence, and has not made credibility determinations.

42 U.S.C. § 1983 does not confer rights upon an individual. Instead, it is a vehicle to seek a remedy for violations of constitutional rights guaranteed elsewhere. Graham v. Conner, 490 U.S. 386, 393-94, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). A plaintiff proves a claim under Section 1983 by showing that: (1) the defendant was acting under color of state law; and (2) the defendant deprived the plaintiff of rights secured by the United States Constitution or laws of the United States. Adickes v. S.H. Kress & Co., 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970). There is no dispute that the plaintiff has satisfied the "under color of state law" requirement. The only question is whether his constitutional rights were violated by the named defendant.

The government has a constitutional obligation to provide medical care for the individuals it incarcerates, and "deliberate indifference to the serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). A claim for deliberate indifference to a prisoner's serious medical needs has both a subjective and an objective component. See Farmer v. Brennan, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); Comstock v. McCrary, 273 F.3d 693, 702 (6th Cir. 2001). To satisfy the objective component, the plaintiff must show that he had a "sufficiently serious" medical need. Comstock, 273 F.3d at 703. A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Blackmore v. Kalamazoo Cnty., 390 F.3d 890, 897 (6th Cir. 2004).

For the subjective component, the plaintiff must demonstrate that the defendant had a sufficiently culpable state of mind, in other words, that the official acted with "deliberate indifference" to the plaintiff's serious medical need. Farmer, 511 U.S. at 834, 114 S.Ct. 1970. Although this standard does not require a showing that the defendant acted with a purpose or intent to inflict harm, the standard is not satisfied by a showing of negligence. See Comstock, supra; Estelle, 429 U.S. at 105, 97 S.Ct. 285 ("[A]n inadvertent failure to provide adequate medical care cannot be said to constitute" a violation of the Eighth Amendment). The plaintiff must show more than medical malpractice and negligence on the part of the defendant because the subjective requirement acts "to prevent the constitutionalization of medical malpractice claims." Comstock, 273 F.3d at 703. See also Whitley v. Albers, 475 U.S. 312, 319, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) ("To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety. . . . It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause.").

After review of the evidence before the Court, the Court finds that the two inadequate medical care claims brought against Defendant DCSO should not proceed to trial and should be dismissed. There is simply insufficient evidence before the Court raising a genuine issue of material fact on these claims which requires that the claims be heard by a jury. Based on the evidence which is before the Court, no reasonable jury could find that the medical care provided to the plaintiff was constitutionally inadequate.

With respect to the plaintiff's need for mental health treatment, even if the Court assumes that the plaintiff's evidence is sufficient to show a serious mental health need, evidence that the

8

plaintiff was treated with deliberate indifference is lacking. Although the evidence before the Court regarding the plaintiff's mental health treatment is somewhat minimal, the evidence shows that he was not ignored. He entered the CJC on September 11, 2010, and was initially seen by an intake nurse. Although the plaintiff's evidence shows that he explained his need for mental health treatment and medications to the nurse, there is no evidence before the Court that the plaintiff was suffering from any type of acute mental health need that required immediate treatment and there is no evidence upon which a jury could conclude that the intake nurse acted with deliberate indifference by not immediately referring him to a mental health provider.

Further, the evidence shows that the plaintiff was scheduled for a mental health assessment on September 17, 2010. When this assessment did not occur, he was rescheduled and seen by a mental health provider on September 27, 2010, and provided with his mental health medications. While the assessment did not occur as promptly as the plaintiff may have wished, there is no evidence in the record which shows that the initial seven day period it took for the first mental health assessment to be scheduled, the cancellation of the September 17, 2010, assessment, or the ten day period it took for the assessment to be rescheduled were acts taken with deliberate indifference to the plaintiff's need for mental health treatment. Although the plaintiff testified that he was paranoid, anxious, and was having other issues because of his lack of medication, there is no evidence that he suffered from significant mental health problems during the 17 day period he did not have his medications or exhibit behavior which was out of the ordinary or which obviously indicated that he required immediate mental health treatment.

Although "medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference," Terrance v. Northville Reg.'l Psychiatric Hosp., 286 F.3d 834, 843–44

(6th Cir. 2002) (internal quotation marks and citation omitted), the evidence before the Court does not support such a conclusion. The short delay the plaintiff encountered in receiving a mental health assessment and a prescription for his mental health medications simply does not rise to the level supporting a claim that he suffered unconstitutional medical care.

With respect to the plaintiff's claim regarding his hand injury, the Court finds that there is a dearth of evidence upon which a reasonable jury could conclude that the plaintiff suffered from a serious medical need regarding his hand. He contends that his hand was swollen and painful and had a "knot" and that he cannot put as much pressure on his wrist as he could before the injury. However, this testimony shows only that the plaintiff suffered an injury, not a serious medical need. There is no evidence before the Court that his hand injury was accompanied by any other type of objective symptoms indicating a serious medical need such as broken skin, bleeding, or other obvious factors of a major medical injury. Further, there is no evidence before the Court that any medical care provider who assessed the plaintiff after his transfer from the DCSO noted any kind of significant injury to the plaintiff's hand or noted the need for any additional treatment for his hand other than a splint. Not every injury suffered by a prison inmate rises to the level of a serous medical need and there is no evidence before the Court showing that the plaintiff's hand injury had been diagnosed by a physician as mandating treatment or was so obvious that even a lay person would easily recognize the necessity for a doctor's attention. See Blackmore, supra.

This case warrants dismissal because of the lack of evidence supporting the plaintiff's underlying claim that he was treated in an unconstitutional manner. Nonetheless, an additional basis for dismissal exists because the plaintiff has offered no evidence supporting a claim that the DCSO, as opposed to individual employees, was responsible for the alleged constitutional wrongdoings.

Liability against Defendant DCSO under Section 1983 must be premised upon a showing of municipal liability under the analysis set out in Monell v. Department of Soc. Servs., 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). In Monell, the United States Supreme Court held that a municipality can be found liable under Section 1983 if a policy of the municipality itself causes the constitutional violation at issue. As the Supreme Court explained, "[i]t is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." Monell, 436 U.S. at 694. The plaintiff must show that the governmental entity was the "moving force" behind the violation of the constitutional rights at issue. City of Canton v. Harris, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), abrogated in part on other grounds, Farmer v. Brennan, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quoting Monell, 436 U.S. at 694), and that the complained-about action "was taken with the requisite degree of culpability and [the plaintiff] must demonstrate a direct casual link between the [defendant's] action and the deprivation of federal rights." Gregory v. Shelby Cnty., 220 F.3d 433, 442 (6th Cir. 2000) (quoting Board of Cnty. Comm'rs of Bryan Cnty., 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)). Even if a constitutional violation occurred in the treatment of the plaintiff's mental health problems or his hand injury, he has not set forth any evidence showing that the violation was caused by an official, policy, custom, or practice of the DCSO.[2]

---

[2] At the hearing, counsel for the DCSO noted that the DCSO is not a legal entity amenable to suit under Section 1983 but that he was not raising this argument for dismissal because substitution of the Metropolitan Government of Nashville and Davidson County in place of the DCSO would cure any problem with the DCSO being improperly named as the defendant.

## RECOMMENDATION

Based on the foregoing, the Court recommends that this action be DISMISSED WITH PREJUDICE because there are no facts upon which a reasonable jury could find in favor of the plaintiff on his claims under 42 U.S.C. § 1983.

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of the Report and Recommendation upon the party and must state with particularity the specific portions of this Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. See Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

JULIET GRIFFIN
United States Magistrate Judge